FILED
United States Court of Appeals
Tenth Circuit

September 24, 2007

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

THE BURLINGTON NORTHERN
AND SANTA FE RAILWAY
COMPANY,

    Plaintiff-Appellant and
    Cross-Appellee,

v.

CHARLES B. GRANT; CHARLES
B. GRANT REVOCABLE TRUST,

    Defendants-Appellees and
    Cross-Appellants,

and

STATE OF OKLAHOMA;
OKLAHOMA DEPARTMENT OF
ENVIRONMENTAL QUALITY;
OKLAHOMA DEPARTMENT OF
AGRICULTURE, FOOD AND
FORESTRY,

    Amici Curiae.

No. 04-5182, 04-5190 & 05-5137
(Consolidated)

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 03-CV-162-JHP-SAJ)

---

Alok Ahuja, Lathrop & Gage, L.C., Kansas City, Missouri (Hugh D. Rice,
Rainey, Ross, Rice & Binns, PLLC, Oklahoma City, Oklahoma, and David
E. Cowen, McLeod, Alexander, Powel & Apffel, Galveston, Texas, with him

on the briefs), for Plaintiff-Appellant and Cross-Appellee.

Linda C. Martin, (Sam P. Daniel and Young H. Pei with her on the briefs), Doerner, Saunders, Daniel and Anderson, L.L.P., Tulsa, Oklahoma, for Defendants-Appellees and Cross-Appellants.

John Trevor Hammons, Assistant Attorney General, Environmental Protection Unit, Oklahoma City, Oklahoma, filed an amicus brief on behalf of the State of Oklahoma, the Oklahoma Department of Environmental Quality, and the Oklahoma Department of Agriculture, Food and Forestry, Amici Curiae.

---

Before **HENRY** and **BRISCOE,** Circuit Judges, and **ROBINSON,** District Judge.[*]

---

**BRISCOE**, Circuit Judge.

---

Plaintiff Burlington Northern & Santa Fe Railway Co. (BNSF) appeals (Case No. 04-5182) the final judgment of the district court and additional interlocutory orders preceding final judgment. BNSF also appeals an order directing it to pay Defendants Charles Grant and the Charles Grant Revocable Trust (Grant) attorney fees (Case No. 04-5190).[1] Grant, in turn, cross-appeals the dismissal of his spoliation defense (Case No. 05-5137).

We exercise jurisdiction pursuant to 28 U.S.C. § 1291. In case

---

[*] The Honorable Julie A. Robinson, United States District Judge for the District of Kansas, sitting by designation.

[1] Unless otherwise noted, "Grant" includes both Grant the individual and the Charles Grant Revocable Trust. For ease of reference, the pronoun "he" is used to describe the inclusive form of "Grant."

-2-

numbers 04-5182 and 04-5190, we REVERSE and REMAND for further proceedings. In case number 05-5137, we AFFIRM.

I

*A. Factual Background*

This dispute centers around a tar-like material (TLM) that BNSF alleges moved onto its property from adjacent property owned by Grant. The property BNSF and Grant now own was once the location of an oil refinery which operated from 1917 until 1932. TLM was a waste by-product of the refinery's operation.

BNSF's property is located immediately east, and allegedly downhill, from Grant's property. BNSF alleges that in the early 1970s Grant personally directed, or had reason to know of, substantial earth moving and construction on his property which BNSF alleges precipitated the migration of TLM onto its property. BNSF contends the migration of TLM has continued over a period of decades as a result of repeated heat expansion occurring each summer. BNSF investigated the TLM and methods for removing it from its property and undertook the removal and off-site disposal of the material in July 2001, expending a total of $469,000 on this project. BNSF also constructed a 2-3 foot berm on the property line to stop the alleged continued migration of TLM onto its property.

*B. Procedural Background*

BNSF brought suit against Grant seeking damages and injunctive relief asserting various legal theories, including claims under the citizen-suit provision of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972. BNSF also alleged the TLM was a public and private nuisance, and sought injunctive relief against Grant in the form of abatement, and damages for unjust enrichment as a result of BNSF's clean-up activities.

The district court granted summary judgment in favor of Grant on several of BNSF's claims. First, it found that BNSF had failed to present a genuine issue of material fact on the "imminent and substantial endangerment" element of its RCRA claim. 42 U.S.C. § 6972(a)(1)(B). Next, the district court concluded that BNSF could not proceed under Okla. Stat. tit. 27A, § 2-6-105(A), an Oklahoma public nuisance statute, because the Oklahoma Department of Environmental Quality (ODEQ) had not issued a prior clean-up order. Third, the district court held that BNSF failed to present a triable issue to obtain injunctive relief on its abatement claim because there was no present TLM migration, and because the court excluded as unreliable the testimony of BNSF's expert regarding the likelihood of future migration.

BNSF proceeded to trial on its private nuisance and unjust enrichment claims. At the close of BNSF's case-in-chief, the district court entered

-4-

judgment as a matter of law for Grant on all remaining claims. Specifically, the district court held that Grant's role in the construction activities of the 1970s did not subject him to personal liability because he was protected by the corporate shield. The district court also held that Grant could not be held personally liable as a successor landowner because BNSF never demanded that Grant abate the alleged TLM migration. As for BNSF's claim of unjust enrichment, the district court held that BNSF failed to establish that it had discharged an affirmative duty for which Grant was responsible.

Alternatively, the district court dismissed all of BNSF's remaining claims on the ground that it had failed to set forth evidence of its damages. Specifically, the district court entered judgment as a matter of law in favor of Grant because it found that BNSF failed to prove the diminution in value that its property suffered as the result of the alleged TLM migration. Further, the district court held that BNSF's proof of damages was deficient because it failed to identify what costs it had expended within the applicable statute of limitations.

The district court also made various evidentiary rulings which limited the evidence BNSF could introduce at trial. Specifically, the district court excluded the expert opinion of BNSF's expert Robert Brownlee (Brownlee), who would testify that TLM migrated from Grant's property onto BNSF's

property. The district court also excluded various photographs and visual descriptions which BNSF proffered to address the alleged TLM migration. Finally, after the entry of judgment as a matter of law, the district court awarded Grant $411,218.99 in attorney fees.

## II

BNSF appeals the district court's grant of summary judgment on its RCRA, abatement and public nuisance claims. BNSF also appeals the district court's judgment as a matter of law on its private nuisance and unjust enrichment claims, several of the district court's evidentiary rulings, and the district court's order awarding Grant attorney fees. Grant, in turn, cross-appeals the district court's dismissal of its spoliation claim.

### A. Summary Judgment

We review the district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party. See Roberts v. Printup, 422 F.3d 1211, 1214 (10th Cir. 2005). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### 1. RCRA

BNSF sought relief under RCRA, a comprehensive environmental statute designed to make certain that solid and hazardous wastes are not disposed of in a manner harmful to the public health or the environment. See 42 U.S.C. § 6902(a). To meet these objectives, RCRA regulates the generation, handling, treatment, storage, transportation, and disposal of solid and hazardous wastes. See 42 U.S.C. §§ 6922-25. To ensure enforcement of these provisions, Congress conferred enforcement power upon affected United States citizens. RCRA's citizen-suit provision, 42 U.S.C. § 6972(a), provides:

> [e]xcept as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf–
>
> [1](B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an *imminent and substantial endangerment* to health or the environment[.]

42 U.S.C. § 6972(a)(1)(B) (emphasis added).

Section 6972(a)(1)(B), requires: (1) the defendant must be a person, including, though not limited to, one who was or is a generator or transporter of solid or hazardous waste, or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal

-7-

facility; (2) that this defendant contributed to, or is contributing to, the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and (3) that such waste may present an imminent and substantial endangerment to health or the environment. See, e.g., Cox v. City of Dallas, Tex., 256 F.3d 281, 292-93 (5th Cir. 2001).

In this case, our focus is upon the "may present an imminent and substantial endangerment to health or the environment" language of § 6972(a)(1)(B). As a threshold matter, it is well established that the operative word in § 6972(a)(1)(B) is "may"; thus, BNSF must demonstrate TLM "may present" such a danger. See Interfaith Community Organization v. Honeywell Int'l, Inc., 399 F.3d 248, 258 (3d Cir. 2005); Cox, 256 F.3d at 299; Dague v. City of Burlington, 935 F.2d 1343, 1355 (2d Cir. 1991), rev'd in part on other grounds, 502 U.S. 1071 (1992). This "expansive language" is "'intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes.'" Dague, 935 F.2d at 1355 (quoting United States v. Price, 688 F.2d 204, 213-14 (3d Cir. 1982)) (emphasis in original).

The Supreme Court has also held that the phrase "may present" communicates an additional idea, that is, it "quite clearly excludes waste that no longer presents" the harm contemplated by § 6972(a)(1)(B). Meghrig v. KFC Western, Inc., 516 U.S. 479, 485-86 (1996). As such,

"'under an imminent hazard citizen suit, the endangerment must be ongoing, but the conduct that created the endangerment need not be.'" Cox, 256 F.3d at 299 (quoting Conn. Coastal Fishermen's Ass'n v. Remington Arms Co., 989 F.2d 1305, 1316 (2d Cir.1993)); see also Price v. United States Navy, 39 F.3d 1011, 1019 (9th Cir. 1994) (holding that RCRA does not require actual harm, but threatened or potential harm will suffice).

Second, the term "endangerment" has been interpreted by courts to mean a threatened or potential harm, thus, it is not necessary that BNSF show proof of actual harm to health or the environment. See Dague, 935 F.2d at 1355-56; United States v. Price, 688 F.2d at 211. In other words, injunctive relief is authorized when there *may* be a risk of harm. This gives effect to Congress' intent "to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes." Dague, 935 F.2d at 1355 (emphasis in original).

Third, the term "imminent" is not defined by RCRA, however, the Supreme Court has held that "[a]n endangerment can only be 'imminent' if it threatens to occur immediately[.]" Meghrig, 516 U.S. at 485 (quotations omitted). Nonetheless, a finding of "imminency" does not require a showing that actual harm will occur immediately as long as the risk of threatened harm is present. Id. at 485-86 (holding that "there must be a threat which is present *now*, although the impact of the threat may not be felt

-9-

until later") (quotations omitted).  In other words, "'[a]n 'imminent hazard'

may be declared at any point in a chain of events which may ultimately

result in harm to the public.'" Davis v. Sun Oil Co., 148 F.3d 606, 610 (6th

Cir. 1998) (quoting Dague, 935 F.2d at 1355-56); see also United States

Navy, 39 F.3d at 1019.  Imminence, thus, refers "to the nature of the threat

rather than identification of the time when the endangerment initially

arose." United States Navy, 39 F.3d at 1019 (citation omitted).

Finally, the word "substantial" is not defined in RCRA or its

legislative history.  Nonetheless, relevant case law has held that an

endangerment is "substantial" under RCRA when it is "serious." Interfaith,

399 F.3d at 259; Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1015

(11th Cir. 2004); Cox, 256 F.3d at 300.  This does not necessitate

quantification of endangerment, as an endangerment is substantial where

there is reasonable cause for concern that someone or something may be

exposed to risk of harm by release, or threatened release, of hazardous

substances in the event remedial action is not taken.  See Calif. Dept. of

Toxic Substances Control v. Interstate Non-Ferrous Corp., 298 F. Supp. 2d

930, 980 (E.D. Cal. 2003).  As such, given RCRA's language and purpose,

"'if an error is to be made in applying the endangerment standard, the error

must be made in favor of protecting public health, welfare and the

environment.'" Interfaith, 399 F.3d at 259 (quoting United States v.

Conservation Chemical Co., 619 F. Supp. 162, 194 (W.D. Mo.1985)).

Here, the district court found that the TLM removed from BNSF's property and remaining on Grant's property failed to satisfy the RCRA's imminency requirement. The district court concluded imminency had not been established because (1) BNSF failed to point to any person who had been injured by TLM or to any study establishing the material threatened to "immediately" cause harm to a person or the environment, (2) neither the ODEQ or the Environmental Protection Agency (EPA) had ever ordered the TLM removed, and (3) BNSF monitored the alleged migration of the TLM onto its property for years without acting.

BNSF claims the district court's rationale for entering summary judgment on this claim is erroneous. We agree. BNSF correctly points out that it is irrelevant when the TLM was deposited on the property and equally irrelevant how long BNSF monitored the TLM before acting. See Parker, 386 F.3d at 1014 ("The section applies retroactively to past violations, so long as those violations are a present threat to health or the environment."). Also, the district court erred by limiting its consideration to only injury to persons when § 6972(a)(1)(B) also requires consideration of imminent and substantial endangerment to the environment. Section 6972(a)(1)(B)'s phrasing in the disjunctive indicates proof of harm to a living population is unnecessary to succeed on the merits. See Interfaith, 399 F.3d at 259.

-11-

Moreover, such a holding would remove from consideration TLM's *potential* harm to health or the environment. See United States Navy, 39 F.3d at 1019 (holding that RCRA does not require actual harm, but threatened or potential harm). Likewise, a finding of "imminency" does not require a showing that actual harm will occur immediately, as long as the risk of threatened harm exists. See Meghrig, 516 U.S. at 485-86. Finally, prior administrative action on the part of the ODEQ or the EPA is simply not a prerequisite to a citizen suit. In fact, "no citizen suit can proceed if either the EPA or the State has commenced, and is diligently prosecuting, a separate enforcement action." Id. at 486. In short, the district court read too narrowly the "imminent and substantial endangerment" prong of 42 U.S.C. § 6972(a)(1)(B).

We also conclude that there are genuine issues of material fact as to whether TLM "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). By way of example, various organizations, including the EPA, have generated reports over a number of years which have analyzed TLM samples taken from both on and near Grant's property. Many of these reports indicate that TLM contains carcinogens in quantities greater than those suggested by the EPA. Perhaps the most pertinent of these studies is a 2003 report conducted at the behest of BNSF (the "ERM Report") which analyzed samples of TLM removed

from Grant's property. The ERM Report states that the TLM sampled reveals the presence of certain contaminants which BNSF's expert, Diane DeLillio, testified were present in levels exceeding EPA human health screening levels for industrial outdoor workers. DeLillio testified further that these contaminants were a cancer risk. Likewise, Brownlee testified that this TLM:

> contain[s] elevated levels of known carcinogens in excess of current EPA Region 6 human health screening levels specific to industrial outdoor workers – soil concentrations. The materials also pose a threat to pets and wildlife as they are completely exposed. The presence of this material on the Grant property, which is threatening to recontaminate the BNSF property[,] is an imminent and substantial health risk and endangerment to human health and the environment. The presence of this exposed material and its eruptive nature constitutes a potential threat to stormwater runoff and waters of the United States.

Appx. at 230.

Although Grant vigorously argues that Brownlee later retracted this testimony, we conclude that the record does not support such a reading. We also reject Grant's arguments asking us to weigh the credibility of Brownlee's testimony. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (holding that "[c]redibility determination, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). Therefore, based on this and additional evidence in the record, we conclude that there are genuine issues of material

-13-

fact as to whether the TLM on Grant's property "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Accordingly, we reverse the district court and remand BNSF's RCRA claim for further proceedings.

*2. Abatement*

BNSF next argues that the district court erred in dismissing its claim for injunctive relief seeking removal of the TLM from Grant's property to prevent its future migration. As a threshold matter, we resolve two issues raised by Grant. First we conclude that this issue has been properly preserved for appeal. Second, it is well-established that we review the district court's dismissal of BNSF's claim at the summary judgment stage *de novo* and not, as Grant suggests, for clear error. See Roberts, 422 F.3d at 1214 (reviewing district court's grant of summary judgment *de novo*).

We conclude that the district court erred in dismissing BNSF's claim for injunctive relief. To the extent the district court read Oklahoma law to require an on-going TLM migration as a prerequisite to a plaintiff's obtaining injunctive relief, it erred as a matter of law. Under Oklahoma law, injunctive relief is proper upon a showing that there is a reasonable probability that the injury sought to be prevented will occur if no injunction is issued; a mere fear or apprehension of injury is insufficient. See Sharp v. 251st Street Landfill, Inc., 925 P.2d 546, 549 (Okla. 1996). Moreover,

insofar as the district court discounted the testimony of BNSF's witness, Jennifer Hurley, as unreliable, because it was based upon a visual inspection of the TLM in relation to the berm, rather than a more scientific examination, the district court erred. See Liberty Lobby, Inc., 477 U.S. at 255; see also Seamons v. Snow, 206 F.3d 1021, 1026 (10th Cir. 2000) ("[I]t is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment.").

We also agree with BNSF that there are genuine issues of material fact remaining. In Oklahoma, entitlement to injunctive relief must be established by clear and convincing evidence and the injury alleged must not be speculative. Thomas v. Hampton, 583 P.2d 506, 507 (Okla. 1978). The Supreme Court has held that "the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." Liberty Lobby, Inc., 477 U.S. at 252. Therefore, because Oklahoma law requires clear and convincing proof before a nuisance can be enjoined, we review the grant of summary judgment on the issue of injunctive relief in light of that standard. "Clear and convincing evidence is that measure or degree of proof . . . produc[ing] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." Matter of C.G., 637 P.2d 66, 71, n.12 (Okla.

1981).

When applying this standard to the record presented, we conclude that BNSF's evidence was sufficient to create a triable issue as to whether there is a reasonable probability that TLM on Grant's property will migrate onto the property of BNSF. First, BNSF's experts, Hurley and Brownlee, unambiguously assert that the TLM has continued to move towards the berm, and against it, and that, absent intervention, it threatens to overtop the berm. Next, BNSF points to considerable evidence in the record of past TLM migration onto BNSF's property, an issue which the district court did not resolve and about which there is vigorous dispute. Third, BNSF also points to studies of soil borings which show substantial remaining TLM deposits near the berm. Finally, both BNSF's and Grant's experts set forth the mechanics of TLM migration: heat, expansion, and settling to the lowest elevation. Taken together, we agree that this evidence – suggesting past TLM migration, current TLM migration against the berm, ample quantities of TLM next to the berm, and the mechanics of TLM migration – presents a triable issue as to whether there is a reasonable probability that the TLM on Grant's land will overtop the berm and contaminate BNSF's land. Accordingly, we reverse the district court and remand this issue for further proceedings on the abatement issue.

  *3. Public Nuisance*

The district court granted summary judgment in favor of Grant on BNSF's public nuisance claim brought pursuant to Okla. Stat. tit. 27A, § 2-6-105 of the Oklahoma Environmental Quality Code based upon its conclusion that an ODEQ enforcement action was a precondition to the existence of a public nuisance. On appeal, BNSF argues that the district court misread § 2-6-105 in reaching this conclusion. We agree.

Section 2-6-105 states:

A. It shall be unlawful for any person to cause pollution of any waters of the state or to place or cause to be placed any wastes in a location where they are likely to cause pollution of any air, land or waters of the state. Any such action is hereby declared to be a public nuisance.

B. If the Executive Director finds that any of the air, land or waters of the state have been, or are being, polluted, the Executive Director shall make an order requiring such pollution to cease within a reasonable time, or requiring such manner of treatment or of disposition of the sewage or other polluting material as may in his judgment be necessary to prevent further pollution. It shall be the duty of the person to whom such order is directed to fully comply with the order of the Executive Director.

Okla. Stat. tit. 27A, § 2-6-105.

We review a district court's statutory interpretation under a *de novo* standard. Ward v. Allstate Ins. Co., 45 F.3d 353, 354 (10th Cir.1994). The primary goal of statutory interpretation is to determine and follow legislative intent. Head v. McCracken, 102 P.3d 670, 680 (Okla. 2004). To determine legislative intent, we look at the whole act in light of its general

-17-

purpose and objective. <u>Rout v. Crescent Pub. Works Auth.</u>, 878 P.2d 1045, 1050 (Okla. 1994). When interpreting any statute, we begin with the plain and ordinary meaning of the language employed in the text. <u>George E. Failing Co. v. Watkins</u>, 14 P.3d 52, 56 (Okla. 2000).

We conclude that the district court erred in holding that ODEQ enforcement action was a precondition to the existence of a public nuisance. To begin with, the language of Okla. Stat. tit. 27A, § 2-6-105 is unambiguous. Nothing in the plain language of Okla. Stat. tit. 27A, § 2-6-105 requires an order by the Executive Director of the ODEQ before an act can be declared a public nuisance. Nothing in subsection B purports to limit the scope of subsection A's definition of the term "public nuisance." <u>See</u> <u>Cox v. State ex rel. Okla. Dep't of Human Servs.</u>, 87 P.3d 607, 617 (Okla. 2004). ("This Court does not read exceptions into a statute nor may we impose requirements not mandated by the Legislature."). In fact, a reading of subsections A and B indicates subsection B was not intended to limit subsection A.

Subsection A states, in part, that "[i]t shall be unlawful for any person to cause pollution of any waters of the state or to place or cause to be placed any wastes in a location where they are *likely to cause* pollution . . . ." Okla. Stat. tit. 27A, § 2-6-105(A) (emphasis added). We view subsection A as a declaration of the type of conduct that constitutes a public nuisance under

Oklahoma law, and it is clear that the intent of subsection A is to deem as a public nuisance conduct that either has caused or is likely to cause pollution. Accordingly, pollution need not have already occurred before conduct "likely to cause" pollution can be deemed a public nuisance. Subsection B, on the other hand, demonstrates that the Executive Director's authority under this section is more limited. It states, in part, that "[i]f the Executive Director finds that any of the air, land or waters of the state *have been, or are being polluted*, the Executive Director shall make an order requiring such pollution to cease . . . ." Okla. Stat. tit. 27A, § 2-6-105(B) (emphasis added). The function of subsection B, therefore, is to direct the Executive Director of ODEQ to order abatement of pollution where it has *already* occurred.

The district court's reading of subsection B to effectively limit subsection A would mean that the placement of "any wastes in a location where they are likely to cause pollution" could never be a public nuisance because subsection B requires the pollution to have occurred before the Executive Director of the ODEQ can act to abate the nuisance. This reading contradicts the plain language of Okla. Stat. tit. 27A, § 2-6-105. See Villines v. Szczepanksi, 122 P.3d 466, 470 (Okla. 2005) ("It is presumed that the law-making body has expressed its intent in a statute's language and that it intended what it so expressed.").

-19-

Furthermore, the district court's reading also belies the legislative intent behind Okla. Stat. tit. 27A, § 2-6-105. The Oklahoma Legislature's intent that conduct that causes or is likely to cause pollution be declared a public nuisance is longstanding, and predates the enactment of the present subsection B. In fact, Okla. Stat. tit. 82, § 926(A), from which Okla. Stat. tit. 27A, § 2-6-105(A) was derived, had almost identical language.[2] Notably, Okla. Stat. tit. 82, § 926.4 did not contain a parallel to Okla. Stat. tit. 27A, § 2-6-105(B). We agree with the amici that to conclude, upon adoption of § 926.4 and its relocation to § 2-6-105, that the Oklahoma Legislature intended to depart from its prior position, and to now require an ODEQ order before conduct could be declared a public nuisance, would call for a clearer linguistic signal than mere silence.

We reach a similar conclusion when considering the purpose of the entire code. Okla. Stat. tit. 27A, § 2-3-506(A) states, in pertinent part, that:

> [i]t is the purpose of this Code to provide additional and cumulative remedies to prevent, abate and control pollution. Nothing contained in this Code shall be construed to abridge or alter rights of action or remedies under the common law or statutory law, criminal or civil; nor shall any provision of this Code, or any act done by virtue thereof, be construed as

---

[2] Okla. Stat. tit. 82, § 926.4(A) (West 1990) read: "It shall be unlawful for any person to cause pollution as defined in Section 1 of this act of any waters of the state or to place or cause to be placed any wastes in a location where they are likely to cause pollution of any waters of the state. Any such action is hereby declared to be a public nuisance."

estopping the state, or any municipality or person in the exercise
of their rights under the common law to suppress nuisances or to
abate pollution. Nothing in this Code shall in any way impair or
affect a person's right to recover damages for pollution.

Okla. Stat. tit. 27A, § 2-3-506(A). To require an order of abatement from

the Executive Director of the ODEQ as a precondition to asserting a public

nuisance claim under Okla. Stat. tit. 27A, § 2-6-105, not only undercuts the

"additional and cumulative remedies" the code is intended to provide, but

also precludes an action to "prevent" pollution under this section and would

"impair or affect a person's right to recover damages for pollution,"

contrary to the express intent of the Legislature. See Okla. Stat. tit. 27A, §

2-3-506(A). This result would violate the maxim of statutory construction

that "[w]hen possible, different provisions must be construed together to

effect an harmonious whole." Villines, 122 P.3d at 471.

### B. Judgment as a Matter of Law

BNSF next challenges the district court's entry of judgment as a

matter of law on its private nuisance and unjust enrichment claims. We

review a district court's judgment as a matter of law *de novo*, applying the

same legal standards used by the district court. Knowlton v. Teltrust

Phones, Inc., 189 F.3d 1177, 1186 (10th Cir. 1999).


### 1. Personal Liability

BNSF first argues that Grant, the individual, may be held liable to the extent he was responsible for the maintenance of a nuisance that was under his possession or control. This is an accurate statement of Oklahoma law. See Branch v. Mobil Oil Corp., 788 F. Supp. 531, 533 (W.D. Okla. 1991); Duncan v. Flagler, 132 P.2d 939, 941 (Okla. 1942). However, we disagree that there are genuine issues of material fact in the record that Grant personally directed, participated in or controlled the commission of a tort. While Grant's former employee, Bill Rother, stated that Grant personally stopped by the construction site regularly while the property in question was being converted to a pipeyard, one cannot reasonably infer from this that Grant personally managed the construction, and thereby directed, sanctioned, or actively participated or cooperated in, a positively wrongful act. Additionally, while the record contains an invoice signed by Grant for a substantial amount of dirt to be used as filler during the conversion of the property to a pipeyard, we conclude that this cannot reasonably be viewed as evidence of Grant's management of the how, when, and where of the construction.

Nevertheless, BNSF's next argument, that Grant may be held personally liable as a successive owner, is more convincing. Okla. Stat. tit. 50, § 5 provides "[e]very successive owner of property who neglects to abate a continuing nuisance upon, or in the use of such property, created by

a former owner, is liable therefor in the same manner as the one who first created it." This section provides for liability of successor owners who have or should have knowledge of the existence of the nuisance and of its liability to cause injury. Union Texas Petroleum Corp. v. Jackson, 909 P.2d 131, 141 (Okla. Civ. App. 1995). Despite Grant's arguments to the contrary, the Oklahoma Supreme Court held long ago that an injured landowner need not request abatement from the tortfeasor responsible for a nuisance prior to bringing a nuisance action in instances where the tortfeasor knew or should have known of the nuisance. See Chicago, R.I. & P. Ry. Co. v. Morton, 157 P. 917, 920 (Okla. 1916).

We conclude that there is sufficient evidence in this record to submit to a jury the question of whether Grant, as an individual, had constructive or actual knowledge that the TLM on his property constituted a nuisance to BNSF. This evidence ranges from Grant's stipulation that he was aware of the existence of TLM on his property when he took title to it, to evidence that TLM incursions were open and notorious, in that there is sworn testimony that TLM emerging from Grant's land pushed down a fence between the properties in question and caused a utility pole to list. Thus, while there is not sufficient evidence in the present record to establish Grant's personal liability as a corporate officer, there is sufficient evidence to put before a trier of fact the question of whether Grant was on actual or

constructive notice that the TLM on his property constituted a nuisance to BNSF.

   *2. Damages*

   BNSF next challenges the district court's determination that it failed to submit a triable issue on the question of damages. Specifically, BNSF disputes the district court's holding that damages for a continuing temporary nuisance are limited to the diminution in value of the property in question. However, assuming that diminution in value is indeed the limit on damages recoverable, BNSF next argues that the district court erred in requiring BNSF to carry the burden of proving the amount of that lost value. Finally, BNSF contends that the district court erred in concluding BNSF had failed to prove that its damages were incurred within the applicable two-year limitations period.

*a. Measure of Damages*

   First, BNSF asserts that the amount of damages it may recover for nuisance is the total of the reasonable costs it incurred in attempting to minimize the loss with which it was threatened. We disagree.

    "Damage" or "injury," as typically used in nuisance cases, is the damage or injury resulting from the nuisance. Permanent damages, as well as temporary damages, may be recovered for the maintenance of a temporary nuisance. Briscoe v. Harper Oil Co., 702 P.2d 33, 36 (Okla.

-24-

1985). In nuisance cases, damages are determined by whether the injury suffered is permanent or temporary, rather than whether the cause of injury is permanent or temporary. Id. Accordingly, damages awarded in an action predicated on a nuisance theory may include temporary and permanent injury to land. Id. An injury is deemed temporary, and not permanent, if it is reasonably abatable, that is, capable of being corrected by a reasonable expenditure of money within a reasonable period of time. Moneypenney v. Dawson, 141 P.3d 549, 553 (Okla. 2006). "Damages reasonably incapable of abatement are permanent." Briscoe, 702 P.2d at 36.

As for temporary injury to land, the measure of damages is well-established. Schneberger v. Apache Corp., 890 P.2d 847, 852 (Okla. 1994) ("Oklahoma case law from statehood to the present . . . ha[s] interpreted the proper measure of damages to be diminution in value."). "[T]he measure of damages is the cost of restoring the land to its former condition, with compensation for loss of use of it, if this altogether is less than the diminution in value with the injuries left standing." Houck v. Hold Oil Corp., 867 P.2d 451, 460 (Okla. 1993); see also Tenneco Oil Co. v. Allen, 515 P.2d 1391, 1395-97 (Okla. 1973) (holding that nuisance damages include "clean up" costs in addition to temporary injuries to land). When the cost of repairing the injury is greater than the diminution in the land's value, the latter is the true measure of damages. Houck, 867 P.2d at 460.

-25-

Underlying this rule is the principle of avoidable consequences, which requires plaintiffs to mitigate their damages. Id.

The district court was correct in holding that BNSF can only recover the costs of removing the TLM *if* its restoration costs do not exceed the diminished value of the land. BNSF, in effect, is requesting that we carve out an exception and hold that where restoration costs have been expended prior to the institution of suit, the measure of damages should be the full cost of restoration. BNSF cites no authority from this circuit or from Oklahoma case law which supports its view. Instead, it attempts to distinguish existing precedent by arguing that the cases relied upon by the district court, Schneberger, 890 P.2d at 852 and Peevyhouse v. Garland Coal & Mining Co., 382 P.2d 109, 113 (Okla. 1963), hold that *estimated* repair costs are not recoverable if they are "grossly disproportionate" to the diminution in value of a plaintiff's land, because any contrary ruling would overcompensate the plaintiff. BNSF argues further that both Schneberger and Peevyhouse involved plaintiffs seeking recovery of *estimated* costs for work they had not performed, and which the court found would likely never be performed. While BNSF's arguments are not entirely without merit, we see no need to depart from the well-established Oklahoma law that when the cost of repairing the injury is greater than the diminution in the land's value, the latter is the true measure of damages. Houck, 867 P.2d at 460;

Cf. Schneberger, 890 P.2d at 852 ("Whatever the rationale, the essence of .

. . Peevyhouse . . . has been consistently adhered to in cases giving rise to

temporary and permanent injuries to property.").

b. *Burden of Proof*

Next, BNSF argues that even if the diminution in market value is the

upper limit for temporary damage to property, the district court improperly

allocated the burden of proof to BNSF. We agree.

While it is true a plaintiff must prove all elements of a claim,

including damages, Wilcox Oil Co. v. Walters, 284 P.2d 726, 730 (Okla.

1955), it is equally true that in applying the diminution in value rule,

numerous courts have expressly held that any limit on recoverable damages

is a matter that must be pleaded by the defendant, as it grows out of the rule

of avoidable consequences. See, e.g., McFarland v. Brier, 769 A.2d 605,

610 (R.I. 2001); Davis v. First Interstate Bank of Idaho, 765 P.2d 680, 681

(Idaho 1988). This follows from the recognition that the doctrine of

avoidable consequences is an affirmative defense. See McFarland, 769

A.2d at 610; Davis, 765 P.2d at 681. Oklahoma case law suggests as much.

It is well-established under Oklahoma law that with regard to similar issues

in tort and contract actions, the burden of proving that damages should have

been reduced or minimized is on the defendant. See Cities Serv. Co. v.

Gulf Oil Corp., 980 P.2d 116, 134 (Okla. 1999); Sackett v. Rose, 154 P.

1177, 1181 (Okla. 1916) ("The burden of proving circumstances in mitigation of damages is upon the party guilty of the tortious act or breach of contract."). We conclude that Oklahoma case law requires a defendant to shoulder the burden of establishing diminution in value to set the upper limit of recoverable damages for a temporary injury to land.

*c. Statute of Limitations*

BNSF next argues that the district court erred in holding that it failed to prove its damages were incurred within the applicable limitations period as regards its state law claims. On this issue, we conclude part of BNSF's damages were incurred within the applicable period, but some were not.

Under Oklahoma law, the damages recoverable for a continuing temporary nuisance – alleged here by BNSF – are limited to injuries incurred within the two years immediately preceding the filing of the lawsuit. Branch, 788 F. Supp. at 536; City of Bethany v. Municipal Securities Co., 274 P.2d 363, 367 (Okla. 1954); Haenchen v. Sand Products Co., 626 P.2d 332, 334 (Okla. App. 1981). BNSF filed its lawsuit in March of 2003. Thus, BNSF can recover damages for injuries sustained between March of 2001 and March of 2003.

The statute of limitations for the filing of a nuisance action begins when the injury is complete. Id. (citing Elk City v. Rice, 286 P.2d 275, 278-79 (Okla. 1955)). For a continuing temporary nuisance, such as the

-28-

nuisance alleged by BNSF, the injury is complete upon each alleged invasion, which "gives rise over and over to [new] causes of action for damages sustained within the limitations period immediately prior to suit." Branch, 788 F. Supp. at 536; see also Haenchen, 626 P.2d at 334. Injuries which occur outside the two-year look-back period are outside of the statute of limitations. Fischer v. Atlantic Richfield Co., 774 F. Supp. 616, 619 (W.D. Okla. 1989). Here, the last alleged invasion of TLM onto BNSF's property occurred in June or July of 2001, immediately prior to the erection of the berm by BNSF.

As noted above, one aspect of damages the "victim" of a temporary nuisance can recover "is the cost of restoring the land to its former condition . . . if this altogether is less than the diminution in value with the injuries left standing." Houck, 867 P.2d at 460; see also Haenchen, 626 P.2d at 336 n.2 (holding that "the measure of damages [is] the value of lost or damaged crops or the value of lost rental for the period two years prior to suit being filed and thereafter until trial, plus the permanent damage to the land (before and after) or the cost of removing the obstruction, whichever is less"). Here, BNSF entered into evidence a spreadsheet itemizing its costs of remediation. This included both the cost of building the berm to stop the alleged migration of TLM, the cost of moving a gas pipe to build the berm, and the cost of removing a substantial amount of TLM from its property.

Because the cost of abating a nuisance is one facet of damages for a continuing temporary nuisance, BNSF met its burden of setting forth damages of its cost of restoration within the two-year limitations period.

Nonetheless, Grant is correct to point out that BNSF is not entitled to the costs of removing all TLM on its land simply by performing that removal within a two-year period prior to filing suit, regardless of whether such a clean-up addresses injuries that occurred outside the limitations period. In other words, BNSF can only recover removal costs for the approximately four months of TLM migration between March and July of 2001, because that is the only time period falling within the two-year statute of limitations. To permit BNSF to recover for the removal of all the TLM on its property would, in effect, negate the statute of limitations, as BNSF would then be able to recover for decades of TLM migration. However, because Oklahoma law allows a plaintiff to recover its costs of abatement in a temporary nuisance action, the district court erred in holding that BNSF failed to set forth measurable evidence of damages. See, e.g., Tenneco Oil Co, 515 P.2d at 1395-97 (holding that nuisance damages include "clean up" costs in addition to temporary injuries to land).

In short, while the district court identified the correct measure of damages, it erred in placing the burden on BNSF to prove the limit of damages recoverable. The district court further erred in dismissing BNSF's

remaining claims as falling outside of the statute of limitations. We reverse the district court's dismissal of BNSF's private nuisance claim and we remand for further proceedings.

*3. Unjust Enrichment*

The district court dismissed BNSF's unjust enrichment claim, holding that it had failed to establish an affirmative duty on the part of Grant which he would have been required to perform but for BNSF's performance of the same.[3] BNSF argues that our reversal of the district court's rulings on its public or private nuisance claims would necessitate a reinstatement of its unjust enrichment claim. We agree.

In N.C. Corff P'ship, Ltd. v. Oxy USA, Inc., 929 P.2d 288, 295 (Okla. Civ. App. 1996), the court defined unjust enrichment:

> [A] right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another . . . . [It] arises not only where an expenditure by one person adds to the property of another, but also where the expenditure saves the other from expense or loss.

(quoting Am.Jur.2d Restitution and Implied Contracts § 3 (1973)). To recover for unjust enrichment "there must be enrichment to another coupled

---

[3] We reject as untenable Grant's argument that this issue is subject to a clearly erroneous standard of review because the district court, in dismissing this claim pursuant to Rule 50 of the Federal Rules of Civil Procedure, was somehow making sub rosa findings of fact under Rule 52(b).

-31-

with a resulting injustice." Teel v. Public Serv. Co. of Okla., 767 P.2d 391, 398 (Okla.1985) (superseded by statute on other grounds). Here, BNSF essentially alleges a theory of negative unjust enrichment by alleging that the remediation it undertook saved Grant an expense it would otherwise have had to incur. Because we reverse the district court and reinstate all of BNSF's claims, it may now be able to prove its unjust enrichment theory.

Grant, in turn, argues that because BNSF already has legal claims that will cover the relief sought, its additional claim for unjust enrichment is prohibited. However, Oklahoma courts have squarely rejected this argument. N.C. Corff P'ship, Ltd, 929 P.2d at 295 ("Oklahoma procedure clearly permits pleading alternative remedies, just as it allows alternative theories of recovery, as long as plaintiffs are not given double recovery for the same injury."). Therefore, while BNSF is not entitled to a double recovery for the same injuries, it is entitled to pursue its unjust enrichment claim as an alternative claim. We reverse the district court's dismissal of BNSF's unjust enrichment claim and remand this issue for further proceedings.

*C. Evidentiary Rulings*

BNSF also argues that the district court erred in excluding certain testimonial and documentary evidence. Specifically, the district court granted, without explanation, Grant's motion to exclude Brownlee's expert

-32-

opinion that the TLM BNSF had removed was TLM that had migrated from Grant's property. The district court also excluded Brownlee's testimony regarding TLM he had personally viewed on the properties in question. BNSF was also prohibited from presenting photographs it asserts illustrate TLM migration.

### 1. Exclusion of Brownlee's Testimony

As for the district court's decision to exclude Brownlee's expert opinion, we note that when "[f]aced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993). In performing this gatekeeper role, the judge must assess the reasoning and methodology underlying the expert's opinion, then determine whether it is scientifically valid and applicable to a particular set of facts. See id. at 592-93. We review *de novo* the issue of whether the district court applied the legal test properly, Goebel v. Denver and Rio Grande Western R.R., 215 F.3d 1083, 1087 (10th Cir. 2000), and review the district court's decision to admit or deny the testimony under an abuse of discretion standard, General Elec. Co. v. Joiner, 522 U.S. 136, 143 (1997).

The trial court has the discretion to determine how to perform its

gatekeeping function. See Kumho Tire Co., v. Carmichael, 526 U.S. 137, 152 (1999). Generally, the district court performs this function at a Daubert hearing, although such a hearing is not specifically required. See Hynes v. Energy West, Inc., 211 F.3d 1193, 1203-04 (10th Cir. 2000). Although the district court has discretion in the manner in which it conducts a Daubert analysis, in order to provide for meaningful appellate review the district court must create "a sufficiently developed record in order to allow a determination of whether the district court properly applied the relevant law." Dodge v. Cotter Corp., 328 F.3d 1212, 1223 (10th Cir. 2003) (quotations omitted). Absent specific findings or discussion on the record, it is impossible to determine on appeal whether the district court "'carefully and meticulously' review[ed] the proffered scientific evidence" or instead made an "off-the-cuff" decision to admit or deny the expert testimony. Goebel, 215 F.3d at 1088 (quoting United States v. Call, 129 F.3d 1402, 1405 (10th Cir. 1997)).

Here, the district court failed to make any findings on the record in support of its exclusion of Brownlee's expert testimony. However, Grant argues that a review of the record of the two-day Daubert hearing reveals flaws in Brownlee's methodology and expert opinion that are so patent and obvious that we may have a sufficient record upon which to review the district court's decision to exclude Brownlee's opinion testimony regarding

the migration of the TLM.[4]  We disagree.  What Grant is essentially asking

us to do is to infer that the district court properly performed its gatekeeping

function based on the few statements it made and questions it asked during

the Daubert hearing.  This we are unwilling to do.  In the absence of

findings by the district court to support its ruling to exclude this evidence,

we cannot determine whether it applied the relevant law and properly

performed its gatekeeping function.  Accordingly, we reverse the district

court's ruling on this issue and remand for further proceedings.

As regards the district court's exclusion of Brownlee's testimony

concerning his personal observation of the TLM on the properties in

question, we affirm.  Although the exclusion of Brownlee's lay testimony is

listed among the issues BNSF seeks to appeal, it has failed to provide

arguments or authorities in support of this issue.  We will not review an

issue in the absence of reasoned arguments advanced by the appellant as to

the grounds for its appeal.  Antonio v. Sygma Network, Inc., 458 F.3d 1177,

1184 (10th Cir. 2006).  Therefore, absent reasoned argumentation, we

affirm the district court on this issue.


2. *Photographs*

---

[4] Brownlee's credentials were stipulated to and are not at issue.

As for the district court's decision to exclude photographs BNSF sought to offer as evidence, we are unable to address this issue on the record provided because the copies of the photographs in question are of such poor quality they are impossible to scrutinize in any meaningful manner. Because we cannot review this issue on the record before us, we affirm the district court. See Scott v. Hern, 216 F.3d 897, 912 (10th Cir. 2000) (affirming district court, where the evidentiary record before the court is insufficient to permit an assessment of an appellant's claims of error).

*D. Spoliation*

After receiving extensive briefing, and after holding a two day hearing, the district court entered an order, without analysis, denying Grant's motion for spoliation sanctions. Grant appeals this ruling in the event the district court's judgments appealed by BNSF are reversed, arguing that the district court erred both factually and legally in denying its motion for spoliation sanctions.

As a threshold matter, BNSF argues that this cross-appeal is improper because cross-appeals are to be dismissed where they merely present an alternate grounds for affirmance, but do not ask that the judgment be altered in any way. See, e.g., Jarvis v. Nobel/Sysco Food Serv. Co., 985 F.2d 1419, 1426 n.7 (10th Cir. 1993) (holding that dismissal of cross-

appeal is proper where a party presents alternate grounds to affirm, but does not "ask[] that the judgment itself be altered"). Nonetheless, we conclude that the spoliation issue is not an alternate grounds for affirming the judgment on the merits. Rather, resolution of this issue could result in a possible dismissal of BNSF's action as a sanction, and for reasons having nothing to do with the actual merits of BNSF's claims. We therefore turn to the spoliation issue itself.

We review a district court's denial of a motion for spoliation sanctions for an abuse of discretion. 103 Investors I, L.P. v. Square D Co., 470 F.3d 985, 989 (10th Cir. 2006). In doing so, we accept the district court's factual findings unless they are clearly erroneous. Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, 473 F.3d 450, 456 (2nd Cir. 2007). A spoliation sanction is proper where (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence. 103 Investors I, L.P., 470 F.3d at 989.

Grant's arguments are fourfold. First, Grant argues that the district court erred as a matter of law by concluding that the spoliation doctrine does not apply in cases involving the destruction of an alleged nuisance. Second, Grant argues that the district court erred insofar as it concluded that a finding of bad faith was a necessary prerequisite to a finding that

spoliation occurred. Third, Grant claims that the district court clearly erred by failing to find that BNSF breached a duty to preserve evidence gathered in anticipation of litigation. Finally, Grant claims that the district court clearly erred by failing to find that this alleged destruction of evidence was prejudicial to his defense.

Upon review of the record, and upon consideration of the parties' briefs, we conclude that no reasonable finder of fact could determine that Grant was meaningfully prejudiced by BNSF's removal and destruction of portions of the TLM on its property.[5] The gravamen of Grant's argument regarding prejudice is that he cannot defend this lawsuit because BNSF's clean-up altered the topography and slope of the land, and prevented him from having the alleged TLM migration measured scientifically.[6] We reject this claim. BNSF generated extensive documentation of the condition of the land before and during remediation, and the factual dispute regarding any change in elevation of the remediation site amounts to, at most, one and a quarter inches. In light of this, and absent meaningful evidence that Grant has been actually, rather than merely theoretically, prejudiced, we

---

[5] We therefore decline to address the remainder of Grant's arguments on this issue.

[6] We also find unconvincing Grant's argument that it was prejudiced because its appraisal expert was unable to observe the TLM site, due to BNSF's remediation, and establish how much BNSF's land was allegedly devalued.

affirm the district court's denial of Grant's motion for spoliation sanctions.

III

In sum, we conclude that the district court erred in dismissing BNSF's RCRA, public nuisance, and abatement claims at the summary judgment stage. We further conclude that the district court erred in entering judgment as a matter of law as to BNSF's private nuisance and unjust enrichment claims. In light of these holdings, we vacate the district court's order awarding Grant attorney fees. We also affirm the district court's denial of Grant's motion for spoliation sanctions.

Accordingly, we REVERSE the district court's rulings in 04-5182 and 04-5190 and REMAND for further proceedings. As for case number 05-5137, we AFFIRM the district court.