EBEL, Circuit Judge,
concurring in part and dissenting in part.
I join Part II of the majority opinion. I respectfully dissent from Parts I and III, for two reasons. First, I believe the district court failed to apply the correct legal standard in evaluating Oklahoma’s likelihood of success on the merits under RCRA’s citizen-suit provision, 42 U.S.C. § 6972(a)(1)(B). Second, I believe that the district court also failed to meet its obligation, under Fed.R.Civ.P. 52(a), of making findings of facts and conclusions of law as to all material issues at stake in its determination of that likelihood of success.
I. Injunctions under RCRA’s citizen-suit provision
In order to prevail on its motion for preliminary injunction under RCRA’s citizen-suit provision, Oklahoma must establish that the Poultry Integrators “[have] contributed or ... [are] contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.” 42 U.S.C. § 6972(a)(1)(B) (emphasis added).
In Burlington Northern and Santa Fe Railway Company v. Grant, 505 F.3d 1013 (10th Cir.2007), this court explained that “[a]s a threshold matter, it is well established that the operative word in § 6972(a)(1)(B)[’s ‘may present an imminent and substantial endangerment’ clause] is ‘may’; thus, [the plaintiff] must demonstrate that the [solid or hazardous waste] ‘may present’ such a danger.” 505 F.3d at 1020. Adopting the language of the Second Circuit, we emphasized that “[t]his ‘expansive language’ is ‘intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes.’ ” Id. (quoting Dague v. City of Burlington, 935 F.2d 1343, 1355 (2d Cir.1991), rev’d in part on other grounds, 502 U.S. 1071, 112 S.Ct. 964, 117 L.Ed.2d 130 (1992)).
Furthermore, we explained in Burlington Northern, “the term ‘endangerment’ has been interpreted by courts to mean a threatened or potential harm[;] thus, it is not necessary that [the plaintiff! show proof of actual harm to health or the environment.” Id. (emphasis added). Instead, “injunctive relief is authorized when there may be a risk of harm.” Id. Similarly, a court’s “finding of ‘immineney’ does not require a showing that actual harm will occur immediately as long as the risk of threatened harm is present.” Id. Rather, the key is that the threat itself is present now, even if the impact of that threat “may not be felt until later.” Id. (quoting Meghrig v. KFC Western, Inc., 516 U.S. 479, 485-86, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996)). “[A]n endangerment is substantial where there is reasonable cause for concern that someone or something may be exposed to risk of harm by release, or threatened release, of hazardous substances in the event remedial action is not taken.” Id. at 1021 (emphasis added). And in applying this endangerment standard, courts should err on the side of “protecting public health, welfare and the environment.” Id. (quotation omitted).
II. The district court’s opinion and order
The majority opinion interprets the district court’s opinion and order as having decided Oklahoma’s motion on the likelihood-of-success-on-the-merits prong of the preliminary injunction standard. (Maj. op. at 776-77.) If that interpretation is correct, the district court was obligated, un *784 der Rule 52(a), to make findings of fact “broad enough to cover all material issues” at stake in a consideration of Oklahoma’s likelihood of succeeding on the merits of its RCRA citizen-suit claim. OCI Wyo., L.P. v. PacifiCorp, 479 F.3d 1199, 1203 (10th Cir.2007) (quotation omitted). And as we made clear in Burlington Northern, success on the merits under § 6972(a)(1)(B) requires not “proof of actual harm to health or the environment,” but rather a. demonstration that “there may be a risk of harm.” 505 F.3d at 1020.
Despite this clear mandate as to the standard for success on the merits under RCRA’s citizen-suit provision, and as the majority opinion recognizes, the district court instead applied to its brief factual findings a legal standard requiring proof of actual causation of harm: “The State has not yet met its burden of proving that bacteria in the waters of the IRW are caused by the application of poultry litter,” and “[a]t this junction in the action, the State has failed to meet the applicable standard of showing that the bacteria levels in the IRW can be traced to the application of poultry litter.” (Dist. ct. op. at 1, 7 (emphasis added); see Maj. op. at 776-77.)
The district court correctly held that because Oklahoma was seeking a traditionally disfavored injunction, the State was required to make a heightened showing of the four preliminary injunction factors. (Dist. ct. op. at 3-5, citing O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir.2004) (en banc) (per curiam).) Yet a heightened showing of RCRA’s requirement that “there may be a risk of harm” from a defendant’s conduct, Burlington Northern, 505 F.3d at 1020, is simply not tantamount to a showing of something entirely different — namely, that a defendant’s conduct has caused, such harm.[1]
III. Oklahoma’s pleadings and evidence as to risk of harm,
Had Oklahoma pled and attempted to prove only actual harm, rather than risk of harm, from the land application of poultry litter, I would conclude that despite RCRA’s and Burlington Northern’s explicit language, the district court was correct in holding the State to its claims (and thus in testing those claims by an actual-causation standard). However, the record makes clear that in both the complaint and in the motion for preliminary injunction, Oklahoma correctly asserted § 6972(a)(1)(B)’s endangerment standard and argued that the land application of poultry litter put the waters of the IRW— and the people who use those waters — at risk of harm. Furthermore, the record includes ample evidence to show that during the hearing before the district court, Oklahoma introduced credible testimony tending to show plausible pathways by which the constituents of land-applied poultry litter, including bacteria, could reach both the surface waters and the groundwater of the IRW, thus putting those waters at risk of contamination.
*785 A. Oklahoma’s pleadings
In the Second Amended Complaint, Oklahoma alleged that the Poultry Integrators’ land application of poultry litter constituted both a known risk to the waters of the IRW and a known cause of harm to those waters:
In sum, each of the Poultry Integrator Defendants has long known that such poultry waste disposal practices [i.e., land application of poultry litter] present the threat that constituents of poultry waste will run off and be released into and from the land to which the poultry waste is applied!,] thereby potentially adversely impacting the IRW, including the biota, lands, waters and sediments therein, and that such practices have in fact resulted in constituents of poultry waste running off and being released into and from the land to which the poultry waste is applied!,] thereby adversely impacting the IRW, including the biota, lands, waters and sediments therein.
(Aple. Supp.App. vol. 1 at 50-51, ¶ 56 (emphasis added).) Likewise, Oklahoma alleged, the Poultry Integrators have “long known that poultry waste contains a number of constituents that ban and do cause harm to the environment and pose human health hazards.” (Id. at 51, ¶ 57.) Those constituents were then alleged to include pathogenic bacteria. (Id. at 51, 52, ¶¶ 57(g), 63.)
The State went on to allege that “in a recent open letter published to the citizens of Oklahoma,” certain of the defendants “admitted that their poultry waste ‘potentially impact[s] the health of the rivers and streams’” within Oklahoma’s scenic watersheds. (Id. at 53, ¶ 65 (emphasis added).) Finally, in laying out its cause of action under RCRA’s citizen-suit provision, Oklahoma alleged that “[a]n imminent and substantial endangerment to health or the environment may be presented and is in fact presented as a direct and proximate result of each of the Poultry Integrator Defendants’ respective contribution to the handling, storage, treatment, transportation or disposal of poultry waste in the IRW and lands and waters therein.” (Id. at 59, ¶ 94.) The State requested that the defendants be enjoined “to take all such , action as may be necessary to abate the imminent and substantial endangerment to health or the environment.” (Id. at ¶ 95.)
In its Motion for Preliminary Injunction and Integrated Brief in Support Thereof, Oklahoma argued that “[b]oth the surface water and the groundwater of the IRW are highly susceptible to pollution from land application of animal waste because of the terrain and the geology of th[e] area.” (Aplt.App. vol. III at 701.) The risk of pollution to the IRW’s waters, according to Oklahoma, arises from the region’s karst terrain, which “allows for ready transport of land applied poultry waste, including the fecal bacteria in this waste, into the surface water and the groundwater in the IRW.” (Id.) These fecal bacteria, the State argued, “present[] an imminent and substantial endangerment to human health,” as they may cause a number of infectious diseases. (Id. at 703-06.)
In support of this theory of endangerment, Oklahoma quoted from Defendant Peterson Farms’s Poultry Water Quality Handbook:
Animal waste is a potential source of some 150 disease-causing organisms or pathogens.... When found in water or wastes, these pathogens pose significant threats to humans and other animals through drinking water, contact with the skin, or consumption of fish or other aquatic animals.. Most pathogens die relatively quickly. However, under the right conditions, they may live long *786 enough to cause problems. They persist longer in groundwater than in surface water.
(Id. at 706 n. 6.) The State went on to quote extensively from this court’s explication, in Burlington Northern, of RCRA’s citizen-suit standard for demonstrating that solid or hazardous waste “may present an imminent and substantial endangerment to health or the environment.” (Id. at 714-16.) Oklahoma argued that it had satisfied the RCRA standard by demonstrating “that an imminent and substantial endangerment to human health or the environment may be presented, and in fact is presented, by [the land application of] poultry waste.” (Id. at 717.)
B. Testimony at the hearing on Oklahoma’s motion
After arguing in its pleadings that the land application of poultry waste may present a risk to the waters of the IRW, Oklahoma offered, at the hearing on its motion for preliminary injunction, credible testimony tending to establish plausible pathways by which poultry litter constituents, including pathogenic bacteria, could reach those waters. Most notably, Dr. John Fisher testified at length about the pathways created by the region’s karst geology. (Aplt.App. vol. V at 1621-35.) Explaining a geologic map of the IRW, Dr. Fisher testified as follows:
[Fisher:] This shows the outlying boundary of the Illinois River Watershed. The bold black lines indicate major map faults.... [T]hese are major breaks in the rocks that comprise the bedrock here....
... In this kind of terrain, we’re sitting here in what’s called the Springfield Plateau. It’s part of the Ozark uplift, an uplifted feature in Arkansas. It’s a dome. The dome spills and dips off to the west. It’s why the rivers sort of run in a circle around the edge here in Oklahoma. It’s why the Arkansas runs the way it does because it’s running around the edge of that. The structural development of that dome, plus subsequent structural crustal deformations take place after all the bedrock that’s here in this watershed has been deposited. And so what that means is all these fractures can penetrate every bedrock unit that’s present because the fracturing happened after the bedrock was made.
So if you wanted to sort of paint a brush over this, this place is broken like a cup. The drainage features within this watershed are generally structurally determined. They’re flowing along zones of crustal weakness, along fractures. ... We have a structurally modified bedrock that’s controlling the terrain.
[Question from Plaintiffs counsel:] What’s the effect of all this fracturing and the faulting that you are describing that’s in this watershed as it pertains to the land spreading of poultry waste? [Fisher:] Even with kinds of rocks that aren’t soluble like a granite, this would provide a conduit for waste deposited on the surface and [its] constituents to move directly into groundwater. The bedrock that’s present here in the near surface is the Boone limestone and the Saint Joe limestone, which are both soluble. So this fracturing combined with the soluble nature of those rocks mean[s] these fractures become enlarged by dissolution. And so these become very, very good pathways for wastes that are present on the surface to enter the subsurface.
(Id. at 1622-24 (emphasis added).) Dr. Fisher went on to explain that the soils in the eastern and far western portions of the *787 IRW (as opposed to those in the “sweet spot” in the central portion) have high potential for runoff during rain events. (Id. at 1629.)
Dr. Fisher also summarized the results of peer-reviewed studies, conducted by the University of Arkansas, of poultry-waste runoff on test plots of land:
[Question from Plaintiffs counsel:] And can you tell the Court what was found with regard to those test plots and the runoff of poultry waste?
... Generally, what becomes of the poultry waste constituents after they leave the fields in this runoff?
[Fisher:] Well, as they leave the fields in the runoff and probably in some instances even if they don’t leave the field as runoff, they — once it’s been put on the field, it’s entered the environment. Once water has — enough water has been put on this, if a material is present in the runoff, it enters ephemeral drainageways and those drainageways lead to permanent streams. And so runoff from fields enters streams. And as you can see in this sort of terrain, some of that material will also infiltrate and enter the groundwater.
(Id. at 1634 (emphasis added).) In summary, Dr. Fisher offered his expert opinion that the IRW’s karst geology “permits more ready transport of [poultry waste] materials into the surface water” of the region, and that that karst geology “facilitates the transport of poultry waste and its constituents into groundwater.” (Id. at 1640.)
Other witnesses testifying as to poultry litter’s risk to IRW waters included Oklahoma’s Secretary of the Environment, Miles Tolbert, who quoted a Natural Resource Conservation Service report warning that “‘[n]utrients and bacteria from animal waste applied to fields and in inadequate domestic septic systems could potentially contaminate the Boone Aquifer,’ ” which is the aquifer underlying the IRW (id. at 1392-93); Dr. Christopher Teaf, who testified that because of its fine, powder-like structure, and because of its application in “large quantities on focused areas over a short period of time in the year during which nearly half of the rainfall for the year occurs,” poultry litter is more likely than cow manure to leach into the water supply (id. at 1497-98, 1506-07), that the bacteria in poultry litter have “adaptive mechanisms” that permit them to survive the stresses of being applied to fields (id. at 1500-01), and that the University of Arkansas’s cooperative extension service has warned, in its Dry Poultry Manure Management publication, that mishandled poultry waste poses a risk to surface waters and groundwater (id. at 1504-05); and Dr. Lowell Caneday, who testified, over stiff defense objections, about his experience watching poultry litter run off of a field during a rainstorm (Aplt.App. vol. VI at 1853-55) (“And it looked as though the field was literally moving across the road in front of me as the float materials of the litter floated on the rain.”).
Even after properly excluding the testimony of discredited experts Harwood and Olsen, the district court thus had before it significant credible evidence tending to demonstrate land-applied poultry litter’s risk to the IRW’s waters and the people who use them.
C. The district court’s failure to consider evidence of risk
In reaching its implicit holding (see Maj. op. at 782) that because “Oklahoma could not establish [poultry litter’s] causation” of actual harm to the waters of the IRW, the State “thus ... could not establish a likelihood of success on the merits of its RCRA *788 claim,” the district court failed to make findings of fact or come to conclusions of law “broad enough to cover all material issues” at stake in its determination of Oklahoma’s likelihood of success on the merits, OCI Wyo., 479 F.3d at 1203. For success on the merits under § 6972(a)(1)(B) requires not “proof of actual harm to health or the environment,” but rather a demonstration that “there may be a risk of harm,” Burlington Northern, 505 F.3d at 1020, and Oklahoma put on credible evidence of risk of harm to IRW waters, and to those who use them, by putting on evidence of plausible pathways by which poultry litter constituents, including pathogenic bacteria, could reach those waters. In a motion for preliminary injunction under RCRA’s citizen-suit provision, that credible evidence of risk patently constitutes a “material issue” that the district court was required to address under the correct legal standard before determining Oklahoma’s likelihood of success on the merits.[2]
The majority opinion excuses the district court’s failure to “explicitly discuss RCRA’s ‘may present’ language” on the ground that “given the district court’s view of the evidence, Oklahoma failed to link land-applied poultry litter and the bacteria in the IRW.” (Maj. op. at 476-77.) Yet the district court’s constricted “view of the evidence” is precisely the problem here, as the opinion and order never so much as mentions Oklahoma’s credible evidence of risk, nor the § 6972(a)(1)(B) and Burlington Northern standard under which that evidence was required to be evaluated.
I therefore must conclude that the district court abused its discretion in denying the motion for preliminary injunction on the basis of an implied holding as to Oklahoma’s likelihood of success on the merits, as the court’s failure to apply the correct legal standard to the evidence constitutes a clear “error of law.” See RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1208 (10th Cir.2009) (quotation omitted). As a result, I would vacate the order and remand for the district court to apply the correct legal standard under RCRA to Oklahoma’s evidence of risk, and to satisfy Rule 52(a)’s requirements for findings of fact and conclusions of law in applying that standard.
IV. The remaining factors to be satisfied for a preliminary injunction
Even with its evidence of risk evaluated under the correct legal standard, Oklahoma faces a steep uphill battle in order to succeed on its motion for preliminary injunction. In order to prevail on such a motion, a plaintiff must show “ ‘(1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; [and] (4) the injunction is not adverse to the public interest.’ ” O Centro, 389 F.3d at 999 (quoting Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir.2001)). This is, on its own, a rigorous test, and one made all the more rigorous when, as in this case, the plaintiff seeks an injunction that has been “historically disfavored.” Id. at 975-77. Because Oklahoma is seeking an injunction that would alter the status quo, it must *789 make a “heightened showing” of the four factors necessary for ordinary preliminary injunctions. Id. at 976-77. That “heightened showing” requirement means that the State’s motion “should be even more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is certainly extraordinary.” Id. at 979.
At oral argument, the Poultry Integrators suggested that this injunction would have a substantial impact on local industry. Furthermore, trial itself is now just a few months away. Thus, I have significant doubt as to whether Oklahoma could prevail under the district court’s heightened scrutiny of the three non-merits prongs of the preliminary injunction analysis. Nonetheless, it is for the district court, not this court, to make that determination in the first instance. The district court’s opinion and order was not grounded in those non-merits factors, and neither is the majority opinion.
V. Conclusion
The district court’s ruling was in error because it failed to apply RCRA’s substantial endangerment test to Oklahoma’s credible evidence of risk, and instead required the state to offer proof of extant bacterial contamination actually caused by land application of poultry litter. And while the majority opinion articulates the proper legal standard of endangerment and risk (Maj. op. at 777-78), it errs by (1) failing to consider, under that standard, Oklahoma’s credible evidence of risk to the IRWs waters and those who use them; and (2) failing to hold the district court to the mandate of Rule 52(a), which requires that the district court — not this court— make findings of fact and reach conclusions of law as to Oklahoma’s likelihood of success on the merits under RCRA’s citizen-suit provision.
This court has made clear that under Rule 52(a), “[i]t is not our function to search the record and analyze the evidence in order to supply findings which the trial court failed to make.” OCI Wyo., 479 F.3d at 1205 (quotation omitted). Yet that is exactly the function the majority opinion performs (see Maj. op. at 777-78) in order to conclude that the district court held “by implication” that the State “could not establish a likelihood of success on the merits of its RCRA claim” (id. at 782). I conclude, instead, that we must hold the district court to its obligation under the Federal Rules.
Therefore, I would vacate the district court’s order and remand for the district court to satisfy its burden of evaluating Oklahoma’s likelihood of success on the merits under the correct legal standard, or of making findings of facts and reaching conclusions of law as to one or more of the remaining three prongs of the preliminary injunction standard, as heightened under O Centro. In either case, the findings of fact must be made and the conclusions of law must be reached in the first instance by the district court, not by us.

. I note that if the RCRA standard were, instead, one of actual causation — of extant, consummated harm produced by solid or hazardous waste — I would agree with the majority’s conclusion that Oklahoma failed to demonstrate a likelihood of success on the merits. Once we properly discount the testimony of the two discredited expert witnesses, Drs. Harwood and Olsen, there is no credible evidence in the record that would demonstrate, under the heightened scrutiny standard of O Centro, that bacteria from the land application of poultry litter has contaminated the waters of the IRW. Because § 6972(a)(1)(B)’s standard is risk of harm rather than actual harm, however, "Oklahoma's failure to establish a causal link between the land application of poultry litter and bacteria in the IRW” (Maj. op. at 777) is not dispositive of its likelihood of success on the merits.

. Before this court, Oklahoma argued that the district court’s actual-causation standard was legal error under RCRA not only because it required a demonstration of actual harm rather than a demonstration of risk of harm, but also because it established a “sole cause” requirement. (See Maj. op. at 778.) I agree with the majority opinion's conclusion that this straw-man argument was unfounded, and that the district court's opinion does not create a "sole cause” requirement.